**Jimmy MERCHANT and Herman Santiago, Plaintiffs,**

v.

**Emira LYMON, as Widow and Administratrix of the Estate of Frank Lymon, Morris Levy, Big Seven Music Corp., Roulette Records, Inc., and Broadcast Music, Inc., Defendants.**

**No. 87 Civ. 7199 (VLB) (NRB).**

United States District Court,
S.D. New York.

July 23, 1993.

---

**1052**

Carl E. Person, New York City, for plaintiffs.

Edwards & Angell, New York City (Ira G. Greenberg, of counsel), for defendants.

Silverman & Shulman, P.C., New York City (Alan L. Shulman, of counsel), for intervenor.

BUCHWALD, United States Magistrate Judge.

This litigation is primarily an action for a declaration of rights to the copyright of the hit song *Why Do Fools Fall in Love?* ("*Fools*"). In their complaint, filed in 1987, plaintiffs claim, *inter alia*, that the copyright registration, as filed and as amended, inaccurately attributes authorship credit for *Fools* and that they are co-authors of the song with Frank Lymon. As co-authors, each plaintiff asserts a claim to an ownership share of the *Fools* copyright and a proportionate share of the royalties earned from its exploitation.

Plaintiffs are two of the original members of the singing group, Frankie Lymon and the Teenagers—comprised also of Lymon, Joe Negroni and Sherman Garnes, each now deceased—who in 1956 recorded *Fools* for Gee Records, then owned and operated by George Goldner, also now deceased. Contemporaneously with the recording of *Fools,* Goldner allegedly informed plaintiffs that he would handle the formalities of copyrighting

the song, and, later, that only two of the three authors could be listed on the copyright. Subsequently, Goldner filed the *Fools* copyright with the Copyright Office in 1956, initially listing himself and Lymon as sole co-authors.[1] In the years between the release of *Fools* and the initiation of the current lawsuit, plaintiffs inquired about their interest in *Fools* on a number of occasions, but took no formal legal action until the filing of this lawsuit.

Prior to the parties consenting to trial before a United States Magistrate Judge, the defendants moved for summary judgment predicated on various affirmative defenses arising from plaintiffs' delay in bringing this action. Of particular relevance here are defendants' arguments that plaintiffs' claims are barred by the statute of limitations and the doctrines of laches and equitable estoppel. Plaintiffs countered that they were entitled to a tolling of the statute of limitations due to the defendants' fraudulent concealment and exercise of duress over plaintiffs. Specifically, plaintiffs maintain that Levy told them that they were owed nothing and, on two occasions, that if they persisted in their inquiries he would have them killed. In addressing these arguments, Judge Broderick identified four salient factors concerning plaintiffs' delay:

(1) plaintiffs' lack of sophistication about the music business, including the fact that plaintiffs were 15 at the time they recorded *Fools* and both had limited education; (2) fraud perpetrated against plaintiffs by George Goldner, Morris Levy and their affiliates concerning the ownership of the *Fools* copyright; (3) fear that pressing their claims could result in violence from Morris Levy; and, (4) the fact that plaintiffs, even taking into account all of the above factors, clearly slept on their rights.

Memorandum Order dated April 15, 1992 at p. 6 (the "April 15 Order"), reaffirmed on

---

1. In 1964, defendant Morris Levy purchased Goldner's interest in several music companies, including Gee Records and Patricia Music, a music publishing company which held the copyright for *Fools*. On June 24, 1965, Goldner stated in a letter to the Copyright Office that Levy, rather than Goldner, had co-authored *Fools* with Lymon. The copyright registration was amended to reflect this statement and, thereafter, the copyright was held by Levy's company, Big Seven Music Inc. Levy, Big Seven Music Inc. and Roulette Records, Inc., another company owned by Levy, are referred to collectively as "the Levy defendants".

September 18, 1992, (the "September 18 Order").

With respect to whether the doctrine of fraudulent concealment tolled the running of the statute of limitations, the court found that genuine issues of material fact existed as to whether Goldner, Levy and their affiliates deliberately concealed from plaintiffs the existence of plaintiffs' cause of action and deliberately diverted the *Fools* royalties. April 15 Order at 8. The court also found that factual issues existed as to when plaintiffs knew or should have known that they were being defrauded. *Id.*

Addressing the issue of whether plaintiffs were entitled to a duress tolling to the statute of limitations because of their fear that Levy would retaliate to a lawsuit with violence, Judge Broderick held, as an initial matter, that recognition of the duress toll was consistent with the purposes of the Copyright Act and that New York, as the forum state, provided the relevant rule of decision. The court noted that, under New York law, a duress tolling was only applicable where "duress is part of the cause of action alleged." *Id.* at 11 (citation omitted). Applying this restriction, the court postulated that the entire course of the 37 year relationship between the parties and the manner in which plaintiffs assert that title to the *Fools* copyright was acquired by the defendants "suggests a continuing pattern of duress which was directed not only toward preventing plaintiffs from suing, but toward allowing defendants to acquire and hold title to the *Fools* copyright." *Id.* at 12. Therefore, despite the fact that plaintiffs asserted no claims which explicitly had duress or coercion as an element, the court found that a factual question existed as to whether "the duress

which may have been exercised by the defendants was so integrally related to the plaintiffs cause of action as to toll the statute." *Id.*

Next, Judge Broderick turned to defendants' assertion of laches and equitable estoppel against plaintiffs. With respect to the doctrine of laches the court balanced plaintiffs' delay against the prejudice suffered by the defendants by virtue of the delay and found that, due to the wrongful conduct of Goldner and the Levy defendants, there was a genuine issue of material fact as to whether plaintiffs' suit was timely commenced. *Id.* at 15. Similarly, the court found that a factual question existed as to whether the Levy defendants' wrongful conduct precluded their assertion of an equitable estoppel defense. Accordingly, the court denied the Levy defendants' motion for summary judgment.

Having previously dismissed the claims against defendant Broadcast Music Inc. on February 5, 1992, the court held that the justifications for plaintiffs' delay had no application to their claims against Emira Lymon—Frank Lymon's widow and, as such, the successor to his copyright interest. Consequently, the only remaining named defendants in the action are the Levy defendants.[2]

### *Factual Background*

Trial of the liability issues was held, in part, before a jury and, in part, before the Court from November 10–16, 1992.[3] On behalf of plaintiffs the following witnesses testified: plaintiffs themselves; Kenneth Bobo, a some time member of The Teenagers; Gigi Merchant, plaintiff Merchant's sister; Herbert Cox, a performer with The Cleftones, a singing group; Philip Groia, a writer; and

2. After the trial, Windswept Pacific Entertainment Co. ("Windswept"), the current owner of the entire *Fools* copyright, intervened without opposition for all purposes under Fed.R.Civ.P. 24(a), *inter alia*, asserting the affirmative defenses of laches and estoppel, requesting to be heard as a defendant with respect to fashioning any relief in favor of plaintiffs, and joining in the Levy defendants' post trial motions.

3. At a conference on November 9, 1993 the parties agreed to use a special verdict form addressed to the factual issues in the case. The special verdict form was designed to limit the

number of legal issues on which the jury would be charged. As a result, the special verdict questions focused on the issues of authorship, fraudulent concealment and duress. Based on the jury's responses, the court was left to determine whether plaintiffs were entitled to an ownership interest in the *Fools* copyright, whether plaintiffs were entitled to judgment on their copyright infringement, Lanham Act and common law unfair competition claims and whether plaintiffs were equitably estopped from bringing their lawsuit. In addition, the Levy defendants' equitable defense of laches was tried to the court.

Elder Henix. Plaintiffs also introduced deposition testimony of Levy who had died in the late 1980's, subsequent to the filing of this lawsuit. Defendants called four witnesses: Philip Kahl, a former employee of Patricia Music; Jeri Spencer; Emira Lymon; and Howard Fisher, former controller of Roulette Records.

The factual issues presented at trial, as narrowed by the April 15 Order, can be placed into two broad categories. First, as noted above, the parties disputed whether the copyright certificate filed with the Copyright Office, and later amended, accurately reflected the authorship of *Fools*. Plaintiffs claimed that, despite Goldner's listing as a co-author on the original copyright, he made no contribution to the writing of *Fools*, and rather that plaintiffs co-wrote the song with Lymon. Second, the parties disputed whether plaintiffs were justified in waiting approximately twenty-six years from the time they reached majority under New York law in 1961 until December 14, 1987 to pursue their claims. A review of the trial testimony will be helpful in placing these disputes and the jury's verdict in context.[4]

Plaintiffs testified that in April of 1955, Santiago, Merchant, Garnes and Negroni formed a singing group, eventually known as The Teenagers, that rehearsed at a local junior high school and at other locations around Washington Heights. At first, the group sang popular songs written by other musicians, but they later began to create their own music. Inspired by love letters given to the group by a neighbor, plaintiffs, neither of whom had any formal musical training, developed the melody and lyrics for *Fools*, a song that the group initially called *Birds Sing So Gay*. In the original arrangement of *Fools*, Santiago sang the lead voice and the other group members sang back up. Three witnesses for plaintiff, Gigi Merchant, Howard Bobo and Elder Henix, testified that they heard the original four group members rehearse *Birds Sing So Gay* prior to Lymon's joining the group. Not until June of 1955, approximately two months after the

plaintiffs began to write and rehearse this early version of *Fools*, did Lymon join the group.

Due in part to Lymon's presence, a member of another local singing group introduced The Teenagers to Goldner, who invited them to audition in September of 1955 at Gee Records. After hearing the group perform *Fools*, Goldner suggested that the group rehearse the song with Lymon replacing Santiago as the lead singer. In December of 1955, the group returned to Gee Records' studios and, accompanied by a band of studio musicians, recorded *Fools*. At the time *Fools* was recorded, plaintiffs were fifteen years old and Lymon was twelve.

The parties offer slightly different, but not inconsistent, versions of the events that led up to the writing and recording of the final version of *Fools*. According to Santiago, Lymon made significant embellishments to the song during the time between the audition and recording session, which included, among other changes, adjusting the song to suit Lymon's vocal range. Plaintiffs assert that their documentary evidence, the original record label and an unsigned Standard Uniform Popular Songwriters Contract (Exhibit 1) listing Santiago as well as Lymon and Goldner as authors, corroborates their testimony. Plaintiffs also testified that at about the time *Fools* was recorded, Goldner told plaintiffs that he would handle the registration of the song's copyright but that only two names could appear on the registration form. Plaintiff testified that they chose to include the names of the two lead singers—Lymon and Santiago—thus accounting for the absence of Merchant's name from these exhibits.

Relying largely on documentary evidence and what they argue is the inherent incredibility of plaintiffs' testimony, the Levy defendants maintain that Goldner was personally involved in the writing and arranging of *Fools*. In support of their position defendants submitted the copyright registration and renewals, and contemporaneous advertisements and promotional materials indicat-

---

**4.** Although, at the Court's request, the Levy defendants provided excerpts from the trial transcript neither party has been inclined to order a full transcript. Consequently, the Court has relied largely on its own notes to reconstruct the testimony.

ing that Lymon and Goldner were the sole co-authors of *Fools*. Furthermore, defendants argued that the lengthy saxophone solo in *Fools* was composed during the recording session by Jimmy Wright, a studio musician in the employ of Gee Records. Therefore, the Levy defendants conclude, Goldner was an author under the "work-for-hire" doctrine as well.

As indicated by the answers to Special Verdict Questions 1–3, the jury resolved the issue of authorship in favor of plaintiffs, finding that Santiago and Merchant, in conjunction with Lymon, were co-authors of *Fools*. Furthermore, the jury rejected both of defendants' theories—that Goldner was an author either through his personal involvement or under the work-for-hire doctrine.

The remainder of the evidence at trial focused on whether plaintiffs were justified in waiting approximately twenty-six years to pursue their claims.[5] Plaintiffs testified that on several occasions during this time, beginning in the early 1960's, they, either personally or through professional advisors, attempted to collect royalties from Levy that they believed were due. Each one of the inquiries was met with a refusal on Levy's part to pay such royalties.

Plaintiffs testified that, initially, Levy's refusals amounted to an ambiguous blanket statement that "there was no money for them." However, in two instances when they went to collect the money that they believed Levy owed them, Levy threatened plaintiffs with physical violence. Specifically, Santiago testified—for the first time at trial—that in 1969 he went to Levy's office, accompanied by Garnes, and Levy threatened to kill him. Merchant testified—as he had done at his deposition and in an affidavit filed in opposition to defendants' motion for summary judgment—that in 1977 he, too, went to Levy's office accompanied by Garnes to ask for mon-

ey. According to Merchant, during that visit Levy told Merchant and Garnes to leave his office or he would have them killed. Plaintiffs testified that, as a result of these threats and their belief that Levy had ties to organized crime, they were afraid to file a lawsuit against Levy until December of 1987.

In response, defendants denied that Levy made these threats and contested whether plaintiffs' claimed fear of violence, in fact, prevented them from taking legal action against Levy. Defendants pointed out that prior to 1987 plaintiffs took numerous steps to pursue their claims against Levy as to *Fools* as well as to other songs. Included in these steps was the hiring of an attorney who, in 1984, unsuccessfully challenged Levy's renewal of the copyright to another song, entitled *I Want You to be My Girl*.

As indicated by the answers to Special Verdict Questions 4–11, the jury found that, although Goldner and Levy deliberately concealed from plaintiffs the accrual of royalties from *Fools*, each plaintiff knew or should have known that royalties to which they believed they were entitled had accrued. In addition the jury found that: each plaintiff had been threatened by Levy; each plaintiff feared that Levy would carry out his threats; each plaintiff's fear was reasonable; and each plaintiff's fear lasted until December 24, 1984, the date plaintiffs' former attorney filed a letter with the Copyright Office challenging the registration of *I Want You to be My Girl*. Special Verdict Questions 12–19.

*Implications of The Jury's Findings*

As a threshold matter, plaintiffs seek declaratory relief establishing that they are co-authors of *Fools* and, therefore, are co-owners of its copyright. In addition, although inartfully constructed, the Complaint states a claim for further relief for the deprivation of the remunerative benefit flowing from this ownership.

---

**5.** As noted above plaintiffs were both fifteen years old at the time *Fools* was recorded. During their minority years, plaintiffs received a weekly allowance from the Levy defendants when The Teenagers were performing. In addition, a trust fund was established and a guardian *ad litem* was appointed to administer a trust in which additional performance royalties and other monies were to be deposited for the benefit of

plaintiffs. Upon reaching majority age, in 1961, each plaintiff received approximately $1,000 from his trust fund. The parties do not dispute that, under New York law, plaintiffs were entitled to a tolling of the statute of limitations until they reached majority age. Consequently, it is undisputed that plaintiffs' delay in bringing their lawsuit could not have begun until 1961.

■ Obviously the jury's first findings relate to the plaintiffs' claims of authorship. As a general rule, copyright ownership vests initially in the author or authors of the work. 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 5.01[B] (1992) (hereinafter "Nimmer"). *See also* 17 U.S.C. § 201(a) (1988). Copyright ownership entitles the holder to the exclusive benefit from the exploitation of the underlying work. *Stone v. Williams,* 970 F.2d 1043, 1051 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993) ("*Stone III* "). Thus, plaintiffs appropriately seek damages for the Levy defendants' failure to remit to plaintiffs their proportionate share of royalties received from the exploitation of *Fools. Cf. Stone III,* 970 F.2d at 1051. Alternatively, plaintiffs seek the imposition of a constructive trust, a remedial device imposed in favor of one entitled to property that is wrongfully withheld, which is the equitable analogy to a legal action for an accounting or for damages. *See Stone III,* 970 F.2d at 1051–52.

Once authorship is determined, the issue of whether plaintiffs were justified in delaying the filing of this lawsuit becomes relevant. Extrapolating from the jury's conclusion that plaintiffs were prevented from filing a lawsuit against the Levy defendants because of their reasonable fear of retribution, plaintiffs contend that they are entitled to a tolling of the statute of limitations for the period of time during which the fear operated. Application of this toll to the Copyright Act's statute of limitations would entitle plaintiffs to recovery, not only for damages accruing within three years of suit, *Stone III,* 970 F.2d at 1051, but also for damages accruing back to 1969, when the jury found that plaintiffs' reasonable fear first arose.

The Levy Defendants' current motions challenge these results, arguing that the defendants are entitled to a new trial on the issue of authorship, to judgment as a matter of law that the doctrines of laches and equitable estoppel bar plaintiffs' claims, to judgment as a matter of law that plaintiffs did not suffer duress; and finally, to a new trial because the court erroneously admitted certain evidence of Levy's "mafia connections" and certain "bad act" evidence related to Goldner. In addition, each party moves for judgment on the claims arising under the Lanham Act and common law unfair competition.[6] I will address each motion in turn.

### DISCUSSION

*The Levy Defendants Rule 59 Motion for a New Trial on the Issue of Authorship.*

■ Pursuant to Fed.R.Civ.P. 59, the Levy defendants move to set aside the jury's findings that plaintiffs' co-authored *Fools* with Lymon and that Goldner was not an author either through his personal contribution or the work for hire doctrine.[7] A court may, in its sound discretion, set aside a jury verdict and grant a new trial on the grounds that the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence in support of the verdict. *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992); *Bevevino v. Saydjari,* 574 F.2d 676, 684–685 (2d Cir.1978).

■ While the court should examine the character of the evidence and the complexity of the legal issues involved, it should not set aside the verdict merely because the court would have come to a different conclusion had it been the trier of fact. *Bevevino,* 574

---

**6.** Plaintiffs also cross-move for judgment that each plaintiff receive equal ownership shares, or one-third, of the *Fools* copyright. On the basis of the September 18 Order, we deny plaintiffs' motion. After finding that all of the plaintiffs' claims against Emira Lymon were barred by laches, Judge Broderick ordered a trial of the issues involving plaintiffs and the Levy defendants. Because the Levy defendants' interest related to only one-half of the *Fools* copyright, the plaintiffs' relief is limited to that ownership share.

**7.** Rule 59(a) enables a party to move for a partial new trial limited to discrete issues. *See Brooks v. Brattleboro Memorial Hosp.,* 958 F.2d 525, 530–531 (2d Cir.1992) (citing *Crane v. Consolidated Rail Corp.,* 731 F.2d 1042, 1050 (2d Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984)). *But cf. id.* (partial new trial may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice) (citation omitted).

F.2d at 685; *Wade v. Orange County Sheriff's Office,* 690 F.Supp. 176, 178 (S.D.N.Y. 1987), *aff'd,* 844 F.2d 951 (2d Cir.1988). Nor should the trial court encroach on the jury's role as the primary finder of fact and set aside the verdict unless it is quite clear that the jury's conclusions were egregious. *Bevevino,* 574 F.2d at 684, 686 n. 29. However, when the verdict stems primarily from a jury's evaluation of a witness' credibility, a verdict will rarely be egregious. *Cf. Dunlap–McCuller v. Riese Org.,* 980 F.2d 153, 158 (2d Cir.1992). With this strict standard in mind, we examine the evidence supporting the jury's finding that the plaintiffs were co-authors of *Fools,* and that Goldner was not.

 An author is defined as the person, or one of two or more persons, who has made a copyrightable contribution to the creation of the work. *Childress v. Taylor,* 945 F.2d 500 (2d Cir.1991). First, the Levy defendants attack the finding that plaintiffs' co-authored *Fools* because such a finding is contrary to the documentary evidence, and that plaintiffs' testimony on the issue was simply incredible. In addition to the copyright registrations and renewals, an album label from Gee Records and an article in the June, 1956 edition of Hit Parade Magazine listing Goldner and Lymon as the sole co-authors of *Fools,* the Levy defendants submitted two letters dated July 11, 1984 and December 24, 1984, from plaintiffs' former attorney, who also at one time represented Emira Lymon, to the Copyright Office relating to the misregistration of other songs, but not *Fools.* [8]

Plaintiffs, on their part, offered explanations for each of the documents submitted by the Levy defendants, plaintiffs' exhibits 1 and 3 listing Santiago as an author, and extensive and largely uncontradicted testimony from several witnesses concerning plaintiffs' involvement in the writing of *Fools* prior to Lymon's joining The Teenagers. Essentially, the Levy defendants ask the Court to review the jury's determination that the plaintiffs, and the witnesses who testified on their behalf, were credible. However, the jury heard the conflicting testimony and were free to determine which witnesses to believe. Recognizing that a jury's assessment of credibility should rarely be disturbed, *Dunlap–McCuller,* 980 F.2d at 158, and in light of the substantial evidence presented by plaintiffs in support of their authorship claims, we cannot say that the jury's findings were egregious. Therefore, we find no basis upon which to set aside the answers to Special Verdict Questions 1 and 2.

Conceding that Goldner's personal involvement in the writing of *Fools* was fairly subject to resolution either way, the Levy defendants next argue that the jury's rejection of his authorship under the work for hire doctrine was against the great weight of the evidence. Although the author is generally the party who actually creates the copyrightable work, the Copyright Act of 1909 provides: "the word 'author' shall include an employer in the case of works for hire." *Id.* § 62; *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 743–744, 109 S.Ct. 2166, 2174–2175, 104 L.Ed.2d 811 (1989). *See also* 17 U.S.C. § 201(b). Unlike the later Copyright Act, 17 U.S.C. § 101, the 1909 Act left the definition of "employer" and "work-for-hire" to the courts. *Reid,* 490 U.S. at 744, 109 S.Ct. at 2175. However, the employee must still satisfy the statute's requirements for co-authorship. Thus, in order to establish Goldner's co-authorship of *Fools* through the work-for-hire doctrine, the Levy defendants must establish that Jimmy Wright, a studio musician hired by Goldner, was a co-author of *Fools,* and that Wright was an "employee" as defined by the copyright laws.

---

8. Plaintiffs' explanation for their former attorney's conduct in relation to the challenge to the registration of *Fools* focused on an agreement allegedly made between Emira Lymon and plaintiffs. In 1984, Emira Lymon sued Levy, claiming that she was the sole owner of the *Fools* copyright, and that Levy had failed to pay authorship royalties to Lymon's estate. Plaintiffs assert that in exchange for their testimony about the writing of *Fools,* Emira Lymon agreed to give each plaintiff a one-third ownership share. Emira Lymon denies that such an agreement existed and the Levy defendants supplement her denial by contending that it is illogical to believe that Emira Lymon would share her interest with plaintiffs based merely on their word that they had co-authored *Fools.*

■ Addressing the threshold requirement that Wright is a co-author of *Fools,* the Levy defendants must demonstrate that he made a copyrightable contribution to *Fools,* and that the parties intended to regard themselves as joint authors. *Childress,* 945 F.2d at 507–508. Defendants failed to make this showing. At trial, the Levy defendants adduced no evidence that the saxophone interlude amounted to more than an "incidental" musical change. *Cf. Picture Music, Inc. v. Bourne, Inc.,* 314 F.Supp. 640, 647 (S.D.N.Y.1970), *aff'd on other grounds,* 457 F.2d 1213 (2d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972). *See also Childress v. Taylor,* 1990 WL 196013, 45, 1990 U.S. Dist. LEXIS, 15969, *13 (S.D.N.Y.1990), *aff'd,* 945 F.2d 500 (2d Cir. 1991). The only characterization concerning Wright's contribution to *Fools* came from plaintiffs' testimony that the solo was merely an arrangement that followed from the song's chord progression. Based on this scant evidence and their own hearing of the song, the jury was fully justified in finding that the sax solo was not a substantial contribution to the song. Moreover, the Levy defendants did not demonstrate that at the time *Fools* was recorded that Wright, or Goldner, intended to be accorded the status of a co-author because of the addition of the sax solo. Without such an intention, Wright's contribution, even assuming it met the threshold of authorship, would not give rise to a joint authorship interest.

■ As to the second element in the work-for-hire doctrine, the Levy defendants must establish that Wright was an employee of Gee Records. Generally, courts have applied the work for hire doctrine only to works made by employees in the regular course of their employment. *Reid,* 490 U.S. at 744, 109 S.Ct. at 2175. Several factors, no single one of which is determinative, are to be weighed in determining whether the work was created by an employee or an independent contractor. *Reid,* 490 U.S. at 751–752, 109 S.Ct. at 2178–2179. *Cf. Bourne, Inc.,* 457 F.2d at 1216 (setting forth factors in work-for-hire under 1909 Act). The most important factors include the hiring parties' right to control the manner and means of creation, the method of payment, the skill required,

the provision of employee benefits, the tax treatment of the hired party, and whether the hiring party has the right to assign additional projects to the hired party. *Aymes v. Bonelli,* 980 F.2d 857 (2d Cir.1992).

■ While some of these factors were contested, the Levy defendants produced virtually no evidence concerning the employment relationship between Goldner and Wright. Without having to adopt plaintiffs' argument that the record company's recoupment of its payment to the studio musicians from the royalties from *Fools* precludes a work-for-hire arrangement, we find that this issue was fairly open to resolution in either party's favor. In sum, the Levy defendants' have failed to demonstrate that the jury's findings with respect to Goldner's authorship were seriously erroneous, and thus, their motion for a new trial on the issue of authorship is denied.

### Judgment on Copyright Infringement, Lanham Act, and Unfair Competition Claims

#### Copyright Infringement

■ As described above, plaintiffs' action is one for a declaration of copyright ownership and the recovery of the royalties which accompany such ownership. The action is not properly framed as one for copyright infringement, which requires a plaintiff to show ownership of a valid copyright and the defendant's infringement by unauthorized copying. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131 (2d Cir.1992). *See* April 15 Order; *see generally* Nimmer § 13.01 (setting forth requirements of infringement). Notwithstanding the defendants' wrongful conduct, plaintiffs clearly anticipated that the Levy defendants would exploit the copyright, subject to an accounting for royalties. *See Eden Toys, Inc. v. Florelee Undergarment Co.,* 697 F.2d 27, 36 (2d Cir.1982) (under pre–1978 copyright law licenses can be granted orally or by conduct.) Specifically, Santiago testified that he had intended to sign a Standard Form Songwriters Contract transferring his rights in *Fools* to Goldner. Therefore, according to plaintiffs' own testimony the Levy defendants exploited the *Fools* copyright with the plaintiffs' authorization

and, as a result, judgment in favor of the Levy defendants is granted on plaintiffs' claim for copyright infringement.

### Lanham Act and State Law Unfair Competition Claims

Plaintiffs seek relief under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982). That section provides, in pertinent part, that

> [a]ny person who shall affix, apply, or annex, or use in connection with any goods, ... any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

*Id.* Consistent with the remedial nature of the statute and its expansive language, courts, generally, have construed this provision broadly. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 746 F.2d 120, 124 (2d Cir.1984) (*"PPX I"*). Consequently, Section 43(a) has been employed successfully to combat a wide variety of deceptive commercial practices, including various forms of misappropriation, misrepresentation and other examples of unfair competition. *PPX Enterprises, Inc. v. Audiofidelity, Inc.,* 818 F.2d 266, 270 (2d Cir.1987) (*"PPX II"*) (collecting cases). These practices traditionally involve the misappropriation of another's talents. *Rosenfeld v. W.B. Saunders, Div. of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 241 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990).

■ One form of unfair competition prohibited by the Lanham Act, known as "re-verse palming off," occurs when the wrongdoer removes the name or mark on another party's product and sells that product under a different name.[9] *Id.* The gravamen of the harm in reverse palming off is that "the originator of the misidentified product is involuntarily deprived of the advertising value of its name and of the goodwill that otherwise would stem from public knowledge of the true source of the satisfactory product." *Id.* (citing *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir.1981)). Accordingly, under this theory, by not properly designating plaintiffs as two of the co-authors of the highly successful *Fools,* the Levy defendants deprived each plaintiff of an opportunity to develop a reputation as a successful songwriter. *See Montoro,* 648 F.2d at 607 (plaintiff-actor whose name was removed from all credits and advertising of a film and replaced by another actor's could maintain a claim of reverse palming off because accurately crediting actors for films in which they have appeared "would seem to be of critical importance in enabling [them] to sell their services.")[10]

■ However, in order to establish that they are entitled to damages for the Levy defendants' "reverse palming off," plaintiffs must establish "the potential for a competitive or commercial injury." *Berni v. Int'l Gourmet Restaurants, Inc.,* 838 F.2d 642, 648 (2d Cir.1988). Such potential for injury goes beyond a plaintiff's mere subjective belief that damage has occurred. Instead, a plaintiff must demonstrate the existence of a reasonable interest to be protected. *PPX I,* 746 F.2d at 125. Without reaching the ques-

---

9. For the most part, plaintiffs cite cases which involve "palming off", a second form of unfair competition proscribed by the Lanham Act, and which bears little resemblance to the facts of this case. *Follett v. Arbor House Pub. Co.,* 497 F.Supp. 304 (S.D.N.Y.1980); (exaggeration of the now famous plaintiff's role in creating work), *Benson v. Paul Winley Record Sales Corp.,* 452 F.Supp. 516 (S.D.N.Y.1978) (same); *Gilliam v. Am. Broadcasting Cos.,* 538 F.2d 14 (2d Cir.1976) (attribution of a substantially altered work to its original creator.) These cases are inapposite because the current case does not involve the selling of a good or service of the defendant's own creation under the name or mark of a more popular competitor.

10. Apparently, in addition to the above argument, plaintiffs also assert that the Levy defendants falsely represented that they had permission to publish and record *Fools.* As indicated above, notwithstanding the Levy defendants failure to account for the royalties received from *Fools,* plaintiffs clearly intended that the Levy defendants release and market *Fools.* Therefore, we need not address whether such a claim of false representation of permission to publish and record a song constitutes a violation of the Lanham Act.

tion of whether plaintiffs could meet the standard of specificity for proving the quantum of damages under the Lanham Act, plaintiffs failed to submit sufficient evidence to meet the more forgiving standard of establishing the existence of a reasonable interest to be protected.

■ Plaintiffs' assertions that they lost opportunities that included, *inter alia*, writing songs for other contemporary artists, were entirely unsupported by the record. Although the testimony and evidence indicated that plaintiffs had written other songs performed by The Teenagers, there was no evidence that either plaintiff attempted to write songs for other performers. In addition, there was no evidence that the royalties to which plaintiffs claim entitlement were in any way diminished by the misdesignation of *Fools'* origin. *Cf. Rosenfeld*, 728 F.Supp. at 243 (beneficial owners of copyright lost potential royalties each time a purchaser bought defendants' book.) Moreover, plaintiffs adduced no evidence to indicate that the Levy defendants' actions diminished their ability to sell their "services." *Cf. Montoro*, 648 F.2d at 607. To the contrary, the evidence at trial demonstrated that plaintiffs' careers have been significantly enhanced by their association with *Fools*.

We note further that plaintiffs' position that the Lanham Act covers circumstances where an author has not been properly credited for his authorship role would simply transform virtually every copyright action into a Lanham Act action as well. Here, plaintiffs have an action under copyright law that fully encompasses the injury that they have proven. *Accord Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir.1990) (declining to expand scope of Lanham Act to cases in which copyright law provided an adequate remedy.) Accordingly, plaintiffs have failed to prove that they suffered injury to any interest protected by Section 43(a).

■ Finally, plaintiffs premise their cause of action for common law unfair competition on the same rationale as their Lanham Act claim. Plaintiffs Mem. in Support at p.12. Since the elements of a cause of action for unfair competition under New York law are essentially the same as the elements of false designation of origin under the Lanham Act, *see Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 484 F.Supp. 643, 646 (S.D.N.Y.1979), *aff'd in part and rev'd in part*, 618 F.2d 950 (2d Cir.1980), judgment on the Lanham Act and common law unfair competition claims should be entered in favor of the Levy defendants.

### The Levy Defendants Rule 50 Motion for Judgment as a Matter of Law

A court may grant a motion for judgment as a matter of law, under Fed.R.Civ.P. 50 [11], where the evidence, viewed most favorably to the party who secured the jury verdict, does not provide a legally sufficient basis to support a verdict in that party's favor. *Samuels v. Health and Hosps. Corp.*, 591 F.2d 195 (2d Cir.1979); *Lederle Labs.*, 785 F.Supp. at 1125; 5A James W. Moore et al., Moore's Federal Practice ¶ 50.07[2] (1993) ("Moore's"). Unlike in a motion for a new trial, the trial court cannot assess the weight of the evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after drawing all reasonable inferences in favor of the non-moving party, judgment as a matter of law after the verdict should be granted only when

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture or (2) there is such an overwhelming amount of evidence in favor of the movant that

---

**11.** Rule 50 was amended in 1991 to abandon the formal differences between motions made under prior subsection (a), denominated as a directed verdict, and (b), denominated as judgment notwithstanding the verdict ("JNOV"). Under the 1991 Amendment to Rule 50 a motion made under either subsection is properly termed a motion for "judgment as a matter of law." Moore's ¶ 50.01–1. The amended rule carries forward the substance and procedure of the predecessor rule while employing the new terminology. Therefore, the traditional standards governing a Rule 50 motion are essentially left unchanged. *Jones v. Lederle Labs., Div. of Am. Cyanamid Co.*, 785 F.Supp. 1123, 1125 (E.D.N.Y.), *aff'd*, 982 F.2d 63 (1992); Moore's ¶ 50.01–1.

reasonable and fairminded men could not arrive at a verdict against him. *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567 (2d Cir.1993); *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 329 (2d Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *Lederle Labs.*, 785 F.Supp. at 1125.

■ In support of their Rule 50 motion, the Levy Defendants advance essentially three arguments, each assuming arguendo that duress is a cognizable toll to the copyright law's statute of limitations. Specifically, the Levy defendants maintain that (a) the duress toll is limited to circumstances "in which duress [is] an element of the claim in suit," (b) the threats which form the basis of the duress must be directed toward preventing the filing of a lawsuit and (c) the evidence does not reasonably support the jury's finding that the plaintiffs' fear did not dissipate until December 14, 1987.[12]

We address the Levy defendants' first point, namely that because proof of plaintiffs' underlying claim to copyright ownership does not entail evidence of duress, the toll is not cognizable. Judge Broderick noted in his April 15 Order that, under New York law, duress is available to toll a statute of limitations only where duress is part of the gravamen of a plaintiff's claim. *Id.* at 11 (*citing Cullen v. Margiotta*, 811 F.2d 698, 722 (2d Cir.), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987)); *see also Day v. Moscow*, 955 F.2d 807, 812 (2d Cir), *cert. denied*, — U.S. —, 113 S.Ct. 71, 121 L.Ed.2d 37 (1992); *Jastrzebski v. New York*, 423 F.Supp. 669, 673 (S.D.N.Y.1976) (noting that under New York law duress must be part of conduct for which plaintiff is seeking

recovery.) In order to be sufficiently connected to the underlying claim, the duress experienced by the injured party must have been operating at the time the original cause of action arose and must be continuous. *See Cullen*, 811 F.2d at 722 (plaintiffs who made payments to defendant-employers' political party under duress could similarly feel forced to restrain from filing suit until duress dissipated); *Pacchiana v. Pacchiana*, 94 A.D.2d 721, 462 N.Y.S.2d 256 (2d Dept. 1983) (statute of limitations in action to invalidate antenuptial agreement entered into under duress could be tolled for period of time that duress operated). *Cf. Baratta v. Kozlowski*, 94 A.D.2d 454, 464 N.Y.S.2d 803 (2d Dept.1983) (death threats aimed at preventing lawsuit occurred after underlying claim for conversion accrued).

■ Notwithstanding Judge Broderick's ruling that a factual question existed as to whether Goldner or the Levy defendants acquired the *Fools* copyright, in the context of a relationship characterized by a continuous pattern of duress exerted on plaintiffs, plaintiffs did not establish that, during the early relationship between the parties, either Goldner or Levy exercised dominion over either plaintiff's mind or in any other manner deprived them of their freedom of will. *See Int'l Railways of Cent. Am. v. United Fruit Co.*, 254 F.Supp. 233 (S.D.N.Y.1966), *aff'd in part and rev'd in part*, 373 F.2d 408 (2d Cir.), *cert. denied*, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967). Although the jury found that Goldner and Levy defrauded the plaintiffs of their ownership in the *Fools* copyright and deliberately concealed the accrual of royalties, there was no evidence of

---

**12.** At the outset, the Levy Defendants argue that the copyright laws do not recognize a duress toll to the statute of limitations. Since, as discussed below, we grant the Levy defendants' Rule 50 motion in part, on other grounds, we need not reach the issue of whether in any circumstance, duress may toll the copyright statute of limitations. However, we note that Judge Broderick, in his April 15 Order, held "that under the facts of this case, the recognition of a toll for duress would be consistent with the purposes of the Copyright Act and the duress toll which should be utilized is that provided under the law of this court's forum state, New York." April 15 Order at 11; *Cf. Donahue v. Pendleton Woolen Mills,*

*Inc.*, 633 F.Supp. 1423, 1442 (S.D.N.Y.1986) (acknowledging that duress toll may have a role, albeit a narrow one, in antitrust actions.) *But cf. Center Cadillac, Inc. v. Bank Leumi Trust Co.*, 808 F.Supp. 213, 225 n. 2 (S.D.N.Y.1992) (holding that duress toll to statute of limitations under state law had no application to federal RICO statute of limitations). In any event, it is doubtful that we could revisit Judge Broderick's earlier ruling. *See Wright v. Cayan*, 817 F.2d 999, 1002 n. 3 (2d Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987) (reiterating that law of the case doctrine dictates a general practice of refusing to reopen issues in cases that have already been decided).

coercion with respect to these activities. To the contrary, the testimony indicated that Santiago, Lymon and their guardians voluntarily signed what they believed to be a valid Standard Form Songwriters Contract. Furthermore, plaintiffs approached Levy several times to ask for money prior to 1969, the year of the first threat, as testified to by Santiago, and twelve years after the *Fools* copyright was filed. Such conduct demonstrate a willingness, at this early stage, to confront Levy, at least with requests for additional money.

■ Moreover, plaintiffs' belief that Levy had ties to organized crime is on its own insufficient to support their claim for a tolling of the statute of limitations. Although their belief had been formed around the time they first met Levy in 1957, plaintiffs could not point to a single threat or other action by the Levy defendants prior to 1969 directed at the plaintiffs that could have caused them to be fearful of maintaining their legal interest in *Fools*. *Cf. Jastrzebski*, 423 F.Supp. at 674 (anticipated duress does not give rise to duress toll); *Pahlavi v. Palandjian*, 809 F.2d 938, 942 (1st Cir.1987) (same). Based on the foregoing, plaintiffs failed to prove that they were motivated by fear of either Goldner or the Levy defendants continuously from the time their cause of action accrued. Without proof that the relationship between the parties was characterized throughout by a continuing pattern of duress, plaintiffs' claim that they are entitled to a tolling of the statute of limitations fails as a matter of law.[13]

■ In the event that a reviewing court disagrees with our finding that duress must constitute an integral part of the underlying cause of action in order to justify a toll of the statute of limitations, we examine the Levy

defendants third argument that the evidence does not reasonably support the jury's finding that the plaintiffs' fear did not dissipate until December 14, 1987. As soon as plaintiffs' "compulsion through fear cease[s]," they are no longer entitled to a toll for duress. *Cullen*, 811 F.2d at 722. Despite the jury's finding that the plaintiffs fear reasonably lasted until December 14, 1984, the evidence adduced at trial does not support a finding that the plaintiffs' fear lasted beyond the time they first agreed to take part in a legal action against Levy.

By the late 1970's and early 1980's plaintiffs were publicly acknowledging that Levy had bilked them out of their royalties from *Fools*. During this time, the plaintiffs enlisted the services of several people, including two attorneys, who either attempted to collect copyright royalties from Levy or accessed plaintiffs' legal claim to royalties. Furthermore, plaintiffs testified that they entered into an agreement in 1984 with Emira Lymon to testify on her behalf in her lawsuit against Levy, claiming that Frank Lymon was the sole owner of the *Fools* copyright. Plaintiffs testified that in return for their testimony Emira Lymon agreed to give them each a one-third ownership share of the *Fools* copyright.

In the face of such a persistent effort to vindicate their rights to royalties in *Fools*, plaintiffs' distinction between the asking for money, a request which Levy could simply refuse, and the taking of action which would legally and involuntarily deprive Levy of money cannot be deemed reasonable. Their agreement to join Emira Lymon's lawsuit, albeit not as named plaintiffs, would entail their potentially giving testimony in open court about the events which underlie the current lawsuit. At that point, plaintiffs

---

**13.** The Levy defendants second position that the threats involved must be directed specifically at the filing of a law suit is against the great weight of authority. *See, e.g., Pacchiana v. Pacchiana*, 94 A.D.2d at 721, 462 N.Y.S.2d at 256; *Cullen*, 811 F.2d at 722; *Jastrzebski*, 423 F.Supp. at 673–674 (citing *Kamonitsky v. Corcoran*, 97 Misc. 384, 161 N.Y.S. 756 (1st Dept.1916), *rev'd on other grounds*, 177 A.D. 605, 164 N.Y.S. 297 (1st Dept. 1917)). *See also Pahlavi*, 809 F.2d at 941 (noting that claim would have been strengthened if

threat had been explicitly aimed at preventing a lawsuit) (*citing Jastrzebski*). Instead the logic of these cases suggests that a person induced or coerced by fear to take a certain action is unlikely to feel free to bring suit until that fear subsides regardless of whether the coercion is directed explicitly at the filing of a lawsuit. *Cullen*, 811 F.2d at 723. Therefore, the Levy defendants argument that the coercive action must be specifically aimed at the prevention of filing a law suit adds an element to the duress toll unsupported by the case law.

were represented by counsel and were fully aware of the potential consequences of their testimony. Thus, it was unreasonable for plaintiffs to maintain what had become a purely semantic distinction between their asking for money and their invoking the legal process to obtain it.

Therefore, we hold, alternatively, that the jury's finding that plaintiffs' reasonable fear lasted until December 1984 is against the overwhelming weight of the evidence. As a result, the answers to Special Verdict Questions 16, 19 are set aside and plaintiffs may only pursue those damages which accrued within three years of this lawsuit.

*Equitable Doctrines of Repose: Laches and Equitable Estoppel Laches*

■ In order to prevail on a laches defense, the Levy defendants must demonstrate that plaintiffs, in asserting their rights, were guilty of unreasonable delay and that the delay prejudiced the defendants.[14] *See Stone v. Williams*, 873 F.2d 620, 623 (2d Cir.1989) ("Stone I") (*citing Gardner v. Panama Railroad Co.*, 342 U.S. 29, 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951)). While statutes of limitations and laches promote similar values of repose, the latter's dual inquiry involves a balancing of the equitable circumstances of each case rather than the former's more mechanical application of a time bar within which suit must be instituted. *Id.* at 623–625. Consistent with this balancing, defendants must have suffered some amount of prejudice to successfully invoke laches, even if plaintiffs have a weak or no excuse for their delay. *Id.* at 625. Relevant factors in assessing prejudice include the decreased ability of the defendants to vindicate themselves, on account of the death of witnesses or fading memories and stale evidence, as well as the prejudice that may result from a change in the defendant's position. *Id.* Counterbalancing these factors is the defen-

dant's culpability in creating the circumstances causing the prejudice. *Stone v. Williams*, 891 F.2d 401, 405 (2d Cir.1989) ("Stone II").

In *Stone II*, the Second Circuit reconsidered its affirmance of a grant of summary judgment on the grounds of laches and held that the defendant's egregious conduct, undiscovered at the time of the first ruling, tipped the balance of equities in the plaintiff's favor. *Id.* at 404–405. The plaintiff, a nonmarital child of the late country western singer Hank Williams, brought a lawsuit asserting a claim for a share of her father's copyrights almost twelve years after reaching the age of majority. *Id.* at 404. Without reexamining the trial court's finding of inexcusable delay, the court held that the defendants' knowing participation in a conspiracy to defraud the plaintiff of her copyright interest precluded the defendant's assertion of prejudice. *Id.* at 405.

Relying on traditional equitable principles, *id.* at 404 ("one who seeks Equity's assistance must stand before the court with clean hands") (citation omitted), and on the principle that the defendant's could not fairly rely on a delay caused in part by their own actions, the court held that allowing laches to apply when defendants had acted in such an "unworthy manner" would grant them a windfall. *Id.* at 405. In addition, the court noted that the defendants could have avoided any prejudice by seeking a court declaration of their rights vis-a-vis the plaintiff. *Id.*

■ Similarly, the Levy defendants cannot fairly plead prejudice from the passage of time and the death and disappearance of key witnesses in light of their conduct toward plaintiffs. Focusing first on the years from 1961–1969, beginning with plaintiffs' reaching majority and ending with Levy's threat to

14. The parties tried to the Court the issue of whether the doctrine of laches barred plaintiffs' claim for relief. However, when a jury has decided a factual issue, its determination has the effect of precluding the court from deciding the same fact issue in a different way. *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 873 (2d Cir.1992); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir.1988). Grounded in the Seventh Amendment, this rule furthers the integrity of the judicial process by promoting consistent determinations of any particular question. *Wade*, 844 F.2d at 954 (citations omitted). Accordingly, in determining the applicability of the laches defense, we defer to the jury's findings, when relevant and if supported by the evidence.

Santiago,[15] the Levy defendants argue that plaintiffs' rights were cut off during this period because plaintiffs' delay pursuing their rights was inexcusable and the prejudice to the defendants was manifest. However, the jury's finding that Goldner and Levy had fraudulently concealed from plaintiffs the accrual of royalties from *Fools* for a period of approximately six years undermines the defendants' claim of prejudice. Considering also the jury's finding that plaintiffs' co-wrote *Fools* and the testimony that Santiago signed a songwriter's contract, a ruling barring plaintiffs' claims would allow the Levy defendants to profit from their untoward actions. Under the rationale of *Stone II*, a court sitting in equity should not countenance such a result.

Turning to the period of time between 1969 and 1984, we find that the equitable principles discussed above apply with equal force. As noted earlier, the jury found that Levy threatened plaintiffs on two occasions, in 1969 and again in 1977, and that plaintiffs, due to their reasonable fear that these threats would be carried out, delayed until 1987 the filing of their suit. By virtue of the jury's finding of Levy's egregious conduct, the Levy defendants cannot now complain of the prejudice they would suffer due to their efforts to exploit *Fools* and to the loss of witnesses and business records.

In sum, the Levy defendants knew from the late 1950's the circumstances under which the *Fools* copyright was obtained and attempted until Levy's death either to conceal these facts, *see* Deposition of Morris Levy p. 82 (stating that Levy was a co-author of *Fools* ), or to coerce plaintiffs into abandoning their rights. These actions tip the balance of equities in plaintiffs' favor and relieve plaintiffs from the defense of laches.

*Equitable Estoppel*

 The issue of equitable estoppel was withheld from the jury because the Levy defendants did not offer sufficient evidence to meet the elements of the defense. In order to prevail on the defense of equitable estoppel the defendant must have been misled into reasonably and justifiably believing that the plaintiff would not pursue his claims against the defendant. *Glus v. Brooklyn Eastern Dist. Terminal*, 359 U.S. 231, 234, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959); *Mikinberg v. Baltic S.S. Co.*, 988 F.2d 327, 331 (2d Cir.1993); *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1098 (S.D.N.Y.1989). In the context of a copyright action the plaintiff-copyright holder's rights may be destroyed if the defendant shows that: a) the plaintiff knew of the defendant's wrongful conduct; b) the plaintiff intended that his conduct be acted upon or acted in a way that the defendant had a right to believe it was so intended; c) the defendant was ignorant of the true facts; and d) the defendant relied on plaintiff's conduct to his detriment. *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1539–1540 (S.D.N.Y.1991). *See Lottie Joplin Thomas Trust v. Crown Publishers Inc.*, 456 F.Supp. 531 (S.D.N.Y.1977), *aff'd*, 592 F.2d 651 (2d Cir.1978); *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). *See also* 3 Nimmer, § 13.07 at 13–133 n. 2 (noting that the defense of estoppel may sometimes be asserted in a contract action for royalties.)

 At trial, the Levy defendants offered no evidence that the plaintiffs acted in a manner which justified a belief on the part of defendants that their copyright was free from challenge. Although in some instances, silence and inaction may induce justifiable reliance on the part of the defendant, those circumstances are not present when the defendant is in a position to ascertain the extent of the competing claim. *Hampton*, 279 F.2d at 105. *See also* 3 Nimmer, § 13.07

---

**15.** Notwithstanding our discussion in n. 14 that we are bound by the jury's factual findings in this case, we express serious reservations about the truthfulness of Santiago's testimony concerning Levy's threat. Despite several occasions during the course of this litigation when testimony about this threat would have been useful, Santiago failed to testify until trial about this event. Considering the importance of the duress toll to plaintiff's case and the abject fear he felt following the threat, we find it inconceivable that he forgot to mention the incident or that his attorney counseled him not to mention it. However, we are satisfied that the doctrine of laches would not apply even in the absence of this threat in 1969.

(acknowledging that such acts of omission rarely satisfy elements of estoppel.) In the instant case, not only did Goldner and Levy know of the plaintiffs' claim to ownership of the *Fools* copyright and attempt to conceal the accrual of royalties from them, but Levy also, in part, caused the plaintiffs' silence and inaction. *Cf. Stone II,* 891 F.2d 401, 404, ("one who seeks Equity's assistance must stand before the court with clean hands") (citation omitted). Applying the jury's findings to the estoppel claim it is clear that whatever change in position undertaken by Levy in reliance on the plaintiffs' inaction was unwarranted. Therefore, the Levy defendants' motion for judgment on the grounds of equitable estoppel is denied.

*The Evidentiary Issues*

In support of their motion for a new trial, the Levy defendants renew their objections to the admission of two categories of evidence that reached the jury: 1) the so-called "raft of 'Mafia' evidence", and 2) the testimony of Herbert Cox stating that Goldner had put his name on the copyrights of songs written by Cox's group, The Cleftones, that Goldner had not authored.

With respect to the "raft of Mafia" evidence, the Levy defendants point in particular to plaintiff Merchant's testimony concerning a 1981 Village Voice article which included references to Levy's reputed "Mafia" connections. Defendants advance two arguments as to why this evidence was inadmissible. First, defendants assert that the evidence was hearsay and not within a recognized exception. Second, defendants rely on their offer to stipulate that any actual reliance on Levy's threats would be deemed objectively reasonable rendered this evidence irrelevant under Fed.R.Evid. 401. Addressing each point in turn and without adopting the defendants' characterization of this evidence, we find that neither argument has merit nor, if error, would warrant a new trial.

In the first instance, Merchant testified that he had read the article at the time it was published and that it confirmed for him Levy's reputation as a "gangster". This evidence was introduced to explain Merchant's fear of filing a lawsuit against Levy. *See,*

*e.g., United States v. Delia,* 944 F.2d 1010 (2d Cir.1991) (witness's belief that defendant had ties to organized crime was basis of inference that she acted in accordance with that fear). Upon defendants' counsel's request, on two occasions the Court gave a limiting instruction explaining to the jury that this type of evidence was only admissible to explore the plaintiff's state of mind and could not be considered for its truth. Tr. 218, 221. Furthermore, the Court excluded evidence of Levy's criminal activities that were unknown to plaintiffs during the period which the duress was operative. Therefore, admitted on this basis and with contemporaneous limiting instructions, the evidence of Levy's ties to organized crime does not constitute hearsay under Fed.R.Evid. 801, and was not erroneously admitted.

Second, while we disagree with defendants' assertion that the challenged evidence was prejudicial, *see United States v. Gilliam,* 994 F.2d 97, 100 (2d Cir.1993) ("evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence") (citation omitted), because a stipulation may not provide a jury with a basis for evaluating probative force, the admission of potentially prejudicial evidence with probative value may be proper even though the party against whom it is offered is willing to stipulate to the proposition for which the evidence was offered. *United States v. Valentine,* 644 F.Supp. 818, 822–23 (S.D.N.Y.1986); 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 403[3] (1992 & Supp.1993) (hereinafter "Weinstein"); *cf. Gilliam,* 994 F.2d at 101, (where potentially prejudicial evidence directly establishes an element in the case, defendant may not stipulate to that element in order to bar that evidence). Indeed, as a general rule, a party is not required to accept a judicial admission of his adversary but may insist on proving the fact in order to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect of eliminating from the evidence much of its fair and legitimate weight. Weinstein ¶ 403[3]; *Parr v. United States,*

255 F.2d 86 (5th Cir.), *cert. denied,* 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958). In the current case, plaintiffs' state of mind was relevant and probative to the issue, under the duress toll and under the doctrines of laches and equitable estoppel, of whether their fear was reasonable. Without evidence of the Levy's reputation as it was known to plaintiffs, Merchant and Santiago would have been severely hampered in attempting to explain their motivation for avoiding a legal confrontation with Levy until 1987.

 Addressing Herbert Cox's testimony that Goldner's or one of his employee's names appeared on copyrights for songs written solely by Cox's group, The Cleftones, the Levy defendants argue that Fed.R.Evid. 404 precludes this evidence from reaching the jury. The Levy defendants maintain that this evidence "painted defendants as music industry thieves" for the sole purpose of showing that defendants acted in conformity with such a characterization when dealing with plaintiffs. Defendants' Mem. at 27. However, defendants' reliance on Rule 404(b) is misplaced. Evidence that aids the trier of fact in determining the probative value of other relevant evidence is itself relevant even if the proffered evidence itself does not relate to a consequential fact. *See Weinstein* ¶ 401[05].

Cox testified to eight or nine instances of either Goldner or Henry Glover, an employee of Gee, listing their names on a copyright of a song for which they had no authorship role. Without commenting on whether this activity constituted theft or any other "bad act" as encompassed by Fed. R.Evid. 404(b), we note that this testimony directly refutes the Levy defendants' position that Goldner's listing as an author on the *Fools* copyright entitles him to a presumption of authorship. Even upon reflection, we adhere to our original conclusion that Cox's testimony was relevant, highly probative and not introduced as evidence of Goldner's character. Therefore, this evidence was properly put before the jury.

### CONCLUSION

In conclusion, considering the ample evidence adduced at trial concerning the authorship of *Fools,* and my review of the evidentiary rulings discussed above, I deny the Levy defendants' motion for a new trial. However, in light of the total absence of evidence indicating that the Levy defendants acquired the *Fools* copyright by duress, I find that the duress later exercised by Levy on plaintiffs was not integrally related to plaintiffs' cause of action. Therefore, I grant the defendants' motion for judgment as a matter of law on the issue of the duress toll to the statute of limitations thus limiting recovery to damages that accrued within three years of the filing of the lawsuit. Furthermore, I grant judgment in favor of the Levy defendants for copyright infringement and unfair competition claims arising under both the Lanham Act and common law. In addition, I deny the Levy defendants' motions for judgment based on the equitable doctrines of laches and estoppel. Finally, plaintiffs' cross motions for a judgment as a matter of law on the issue of fraudulent concealment and for judgment that each plaintiff be granted a one-third share of the *Fools* copyright are denied in their entirety.

**IT IS SO ORDERED.**